**UNITED STATES of America, Appellee,**

v.

**Joyce Carter McBRIDE, a/k/a "Tiffinny Harrison", Defendant-Appellant.**

**No. 237, Docket 85–1164.**

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1985.

Decided March 3, 1986.

Ceila G. Barenholz, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., for the S.D. of N.Y.), for the appellee.

Barry Bassis, New York City (Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for the defendant-appellant.

Before MANSFIELD, PIERCE and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment of conviction for conspiracy, criminal conversion, and bank larceny, after a jury trial in the United States District Court for the Southern District of New York, Goettel, *Judge.* Appellant challenges the correctness of the district court's formulation of its charge on conscious avoidance of knowledge, its use of the expression "real possibility" as part of the instruction relating to proof of guilt beyond a reasonable doubt, and the exclusion of testimony of appellant's expert psychiatric witness.

We believe the first two arguments to be without merit. However, we find that the district court erred in excluding the testimony of appellant's expert psychiatric witness; consequently, we reverse and remand for a new trial.

## BACKGROUND

The jury found McBride guilty of one count of conspiracy to convert government property and to commit bank fraud in violation of 18 U.S.C. § 371, two counts of con-version of government property in violation of 18 U.S.C. §§ 641 and 642, and one count of bank larceny in violation of 18 U.S.C. §§ 2112 and 2113(b). She was sentenced to eighteen months terms of imprisonment on the conspiracy count and on one of the conversion counts, to be served concurrently. The imposition of sentence on the second conversion and bank larceny counts was suspended, and appellant was placed on probation for four years to commence upon the expiration of the period of confinement. Appellant was also ordered to pay $25,600 restitution to Korea Commercial Bank of New York ("Bank").

The charges against appellant McBride and a co-defendant, one Errol Kevin Samuel, were based upon allegations that both had planned and participated in a conspiracy to convert government property and commit bank larceny by depositing stolen United States Treasury checks in an account at the Bank and, once the funds became available, making cash withdrawals from the Bank. Defendant Samuel has withdrawn his appeal of his conviction on all counts.

According to the government's witnesses, the defendants opened a partnership business account with the Bank for "Hit Shows Enterprise." The bank employee who handled the opening of the account identified both defendants as the individuals who opened the account on April 9, 1984, though both defendants used names other than their own during the transaction, gave home addresses which were not the residence of either, supplied an organization tax identification number which was in fact a social security number registered to someone else, and supplied a Business Certificate for Partners which listed an answering service as the business address.

The account was opened with a two-hundred dollar cash deposit. The next day, April 10, 1984, a United States Treasury check made payable to the American Bank Note Company for $25,926—later identified as stolen—was deposited into the account.

All withdrawals and checks written upon the account required the signatures of both Rett Price and Tiffinny Harrison, the aliases used by Samuel and McBride respectively when they established the account with the Bank. Bank policy required that checks such as this one be held for 7–10 business days before the funds became available; therefore, no withdrawals against the $25,926 could be made before April 17, 1984. Prior to that date, two checks were written against the account for $75 and $125, and, therefore, on April 17, 1984, any remaining funds in the Hit Show account were traceable solely to the deposited stolen Treasury check. Between April 17 and 24, 1984, more than $25,000 was withdrawn from the account through the use of checks in various amounts. None of the checks was actually presented by defendant Samuel.

On April 19, 1984, McBride cashed a $5,000 check drawn on the account and made payable to "cash." Later that day one Sylvia Hoffman unsuccessfully attempted to negotiate a "Hits Shows" check made out to "cash" in the amount of $5,200; McBride telephoned the bank to inquire as to why Hoffman's withdrawal had been denied; McBride returned with Hoffman to the bank to make positive identification of her, explaining that Hoffman was a "consultant"; Hoffman and McBride then endorsed the check, and the bank cashed it.

Later that day, Thomas Poole, the bank vice-president responsible for approving large checks before payment, received a telephone call from defendant Samuel inquiring about the procedures for having checks cashed by messenger. Poole explained that the bank would not cash such checks without written instructions from a signatory on the account. The following day, April 20, 1984, Samuel sent a messenger, Clyde Gabriel, to the bank to negotiate a "Hit Shows" check made out to "cash" in the amount of $5,000. Gabriel also presented a letter signed by "Rett Price" authorizing the disbursement. The bank cashed the check.

On April 23, 1984, appellant and Hoffman returned to the Bank; Hoffman cashed another $5,200 check; and appellant deposited a second stolen Treasury check. This check in the face amount of $90,000 was made payable to Leah Scheidlinger or Beatrice Eisman; it aroused the suspicions of Poole. Poole asked the appellant to identify the payees named on the check, and she replied that they were investors in the Hit Shows Enterprise; Poole later determined this to be untrue.

On April 24, 1984, a "Hit Shows Enterprise" check in the amount of $5,000 was presented by McBride and cashed by the Bank. After payment on this check, approximately $500 remained available in the account. Under the Bank's 7–10 day clearance policy, funds from the $90,000 deposit could have become available sometime between April 30 and May 3, 1984. On May 2, 1984, both Samuel and McBride attempted to make withdrawals from the account. Samuel attempted to have his messenger, Gabriel, negotiate a check drawn on the "Hit Shows" account, made out to "cash", and endorsed by both signatories on the account. With the assistance of Gabriel, United States Secret Service agents arranged to meet Samuel at a street corner in Queens; this meeting resulted in Samuel's arrest.

The same day, appellant McBride and William Johnson, her cousin, drove to the Bank; first, Johnson entered the bank alone and attempted to negotiate a four thousand dollar check drawn on the Hit Shows account and made out to "cash". However, when the bank refused to cash it, Johnson left the bank; thereafter, McBride entered the bank and was arrested by agents of the Secret Service.

The theory of appellant's defense was that McBride lacked culpable knowledge and was misled by her codefendant Samuel. Appellant presented no witnesses, other than the attempted introduction of expert testimony by a psychiatrist, Dr. Naomi Goldstein. It was the position of the defense that such testimony was necessary to assist the jury in its assessment of appel-

lant's state of mind. This testimony was claimed to be crucial because the defense did not attempt to controvert the prosecution's evidence and instead sought to show that appellant lacked the requisite specific intent.

According to the November 11, 1984 report of Dr. Goldstein, who was appointed by the court to determine appellant's competence, appellant had been the victim of a brutal assault by her former husband, which resulted in some residual organic brain impairment. Dr. Goldstein stated in her report that appellant was competent to stand trial, had a good understanding of the charges against her, understood the proceedings, and was able to assist in her defense. However, in her conclusion, Dr. Goldstein wrote that what was "most striking about Mrs. McBride [was] her poor judgment" and that she thought that McBride "would have been quite vulnerable" at the time in question; still, the doctor declined to offer an opinion as to the issue of responsibility. Further, Dr. Goldstein reported that appellant was "[c]learly ... functional but impaired."

When appellant's counsel attempted to call Dr. Goldstein as a defense witness at the trial, the district court rejected the proffered testimony, questioned the validity of psychiatry generally, and pointed out that "psychiatry is still in its infancy." Then, the trial judge pointed out that there was a possibility of confusing the jurors and that "[a]ny doubt[s] that I have, however, are resolved by the fact that there is no predicate against which the testimony can be offered, absent the defendants' own testimony" and, at an earlier point in the colloquy on this issue between the judge and defense counsel, stated that "the fact that she is not testifying ... is absolutely deadly to your position." The court also suggested that allowing this testimony would "give a clear opportunity ... [to have] the defendant's view of the crime ... put forth by the psychiatrist without the defendant herself being subject to cross-examination on the matters." The court refused to allow Dr. Goldstein to testify and refused to allow the November 11, 1984

report to be read into evidence. The district judge did allow the report to be marked as an exhibit for use on appeal.

For the reasons stated below, we reverse this ruling and remand for a new trial.

## DISCUSSION

■ A district judge has broad discretion with respect to the admission of expert testimony, *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2902, 41 L.Ed.2d 590 (1974). However, "discretion does not mean immunity from accountability," *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir.1976).

■ The admissibility of expert testimony calls for the application of several somewhat overlapping requirements. The evidence must be relevant, as required by Fed.R.Evid. 401 and 402. Expert testimony must be based upon a reliable area of expertise, as has come to be embodied in the rule associated with *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923) which requires that novel scientific evidence must be sufficiently established to have gained general acceptance in the field in which it belongs. Rule 702 of the Fed.R. Evid. specifically applies both of these requirements to the use of expert testimony by requiring that specialized knowledge "assist the trier of fact to understand the evidence or to determine a fact in issue." Finally, otherwise admissible expert testimony may be excluded if its probative value is substantially outweighed by the dangers that it might confuse the issues, be unfairly prejudicial, cause undue delay or waste judicial resources. Fed.R.Evid. 403.

■ The testimony excluded here was the expert psychiatric testimony of a psychiatrist relative to the mental facility of the defendant at the time of the charged crime. This expert was the only witness McBride sought to present. The evidence of McBride's participation in the subject bank episodes was overwhelming and uncontroverted. Her only apparent defense was her contention that she lacked culpable

knowledge of the criminal activity and that her co-defendant manipulated her behavior in furtherance of the crime. Assuming *arguendo* that the psychiatrist would have testified as counsel asserts, the excluded evidence was critical to appellant's defense.

The jury was required to make an assessment of McBride's state of mind.[1] The district court's conscious avoidance charge required an assessment of appellant's knowledge based upon her actions. In our view, testimony by Dr. Goldstein as to the psychological implications of appellant's objectively ascertainable organic brain injury would have been of assistance to the jury in determining whether appellant's activity, as described by the government's witnesses, supported the conclusion that she was aware of a "high probability" of criminal activity. Although a district court may exclude psychiatric testimony which merely offers an opinion about the defendant's capacity to form the mental state required to commit the offense charged, without suggesting the presence of a mental disease or defect, *see United States v. Bright*, 517 F.2d 584, 586 (2d Cir.1975); Fed.R.Evid. 704(b), the psychiatrist here was prepared to testify that McBride suffered such or-

ganic impairment. We believe that, for purposes of determining admissibility, this evidence was highly relevant to a critical fact in issue, namely, appellant's state of mind, and, therefore, was admissible under Fed.R.Evid. 702.

■ The district judge has the discretion to exclude expert testimony as with other types of evidence under Rule 403 if he finds that its probative value is substantially outweighed by its prejudicial effect, or that its admission would confuse the issues, or create needless delay or waste of judicial resources. Here, the district judge made no explicit reference to Rule 403. However, he did refer to the possibility that the disagreement of the experts might confuse the jury. This concern does not seem to have been directed at the use of the particular expert at issue here but to the use of *any* such expert as part of the defense case.

A distillation of statements by the district judge at the time of the proffer suggests several grounds for his exclusion of the proffered evidence. The statement that in his opinion "psychiatry is still in its infancy" suggests that the trial judge con-

---

1. The district judge's instructions as to proof of state of mind included the following:

'However, the government must prove beyond a reasonable doubt that at the time the defendant engaged in the conduct alleged in the indictment, she knew that the checks which were deposited in the Korea Commercial account were not hers to deposit. If the defendant did not know at that time that the checks were someone else's property, the defendant is not guilty of any of the offenses with which she is charged.

Guilty knowledge cannot be established by demonstrating merely negligence or even foolishness on the part of either defendant, the prosecution must establish beyond a reasonable doubt that each knew that the checks were in fact not rightfully his or hers.

In determining whether either defendant acted knowingly or wilfully with respect to the bank larceny and conversion of government property counts—and this is not involved in the conspiracy count—you may consider whether the defendant deliberately closed his or her eyes to what otherwise would have been obvious to him or her. A finding of guilty knowledge may not be avoided by a showing that the defendant simply closed his

or her eyes to what was going on about him or her. Guilty knowledge cannot be established by demonstrating mere negligence or even foolishness on the part of the defendant. However, you may find that a defendant had such knowledge if you find beyond a reasonable doubt that he or she was aware of a high probability that he or she was not authorized to deposit or cash checks into the Hit Shows Enterprise account, and the evidence further discloses beyond a reasonable doubt that he or she closed their eyes deliberately because they preferred not to know too much. If, however, a defendant actually believed that he or she was authorized to deposit or cash the checks, he or she may not be convicted even though that belief may have been foolish or naive.

Thus, if you find that a defendant acted with deliberate disregard of whether he or she was entitled to cash or deposit the checks, and with a conscious purpose to avoid learning the truth, the requirement of knowledge would be satisfied unless the defendant actually believed that he or she was authorized to cash or deposit the checks into the Hit Shows Enterprise account.

Tr. at 856–57.

sidered psychiatry to be a relatively new area of science that has not yet gained general acceptance in the field of medicine. Next, the judge suggested that the possibility of conflicting expert testimony might confuse the jury. Finally, it seemed from the judge's statement that McBride's failure to testify was "absolutely deadly" to the admissibility of Dr. Goldstein's testimony that the district court's primary reason for excluding the testimony was related to McBride's decision not to testify. This conclusion would seem to be borne out by the judge's stated concern that allowing the testimony of the psychiatrist would give a "clear opportunity for ... the defendant's view of the crime to be put forth" without being subjected to cross-examination and his suggestion that without the defendant's testimony there would be no predicate for the psychiatric evidence.

█ These reasons do not suffice to provide a legitimate basis for excluding the proffered evidence. It cannot be gainsaid that psychiatry enjoys general acceptance in the field of medicine. *See Ake v. Oklahoma,* — U.S. ——, 105 S.Ct. 1087, 1096–97, 84 L.Ed.2d 53 (1985) ("[P]sychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental conditions of the defendant at the time of the offense."). The mere fact that there may be conflicting testimony by experts is not a sufficient basis to exclude such evidence. Indeed, not uncommonly, there is conflict among experts on most any subject.

█ As for the court's concern that the defendant's view of the crime could be stated by the expert witness without an opportunity for cross-examination of the defendant, defense counsel's response sufficiently addressed this issue. Counsel pointed out that he wished to offer the testimony of the psychiatrist to explain the impact of appellant's brain injury upon her ability to reach a conclusion from known facts. Dr. Goldstein's report evidences no knowledge of specific facts relating to the alleged conspiracy and, therefore, it would seem that her observations and opinions could be explained without reference to statements made by McBride concerning the charged events. In addition, the court could monitor the expert's testimony to prevent any such statement from inadvertently reaching the jury. It also seems that counsel's stated intent to present the witness to explain the possible effects of a physical injury, the existence of which was undisputed, would negate any concern that there was no predicate for the introduction of the psychiatrist's testimony. We cannot help but note that McBride's mental state was of sufficient concern that the state did not contest appellant's request for psychiatric examination of McBride to determine competence, and the court granted the request.

█ As to appellant's other claims on this appeal, we find that the formulation of the conscious avoidance charge, when read as a whole, adequately expressed the necessary elements of that charge. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *United States v. Toner,* 728 F.2d 115, 124 (2d Cir.1984). The charge made reference to purposeful avoidance of the truth, awareness of a high probability of the fact at issue, and the absence of the defendant's actual belief in the nonexistence of the crucial fact as required by this court in *United States v. Aulet,* 618 F.2d 182 (2d Cir.1980). *See also United States v. Shareef,* 714 F.2d 232 (2d Cir.1983); *United States v. Mohabir,* 624 F.2d 1140 (2d Cir. 1980).

█ As for the district court's use of the "real possibility" language,[2] found in

2. The district judge gave the following instructions regarding the reasonable doubt standard:

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

If based on your consideration of the evidence you are firmly convinced that the defendant is guilty of the crime charged, you must find him or her guilty.

Federal Judicial Center Committee to Study Criminal Jury Instructions, PATTERN CRIMINAL JURY INSTRUCTIONS § 21, p. 28 (1982), in its proposed instruction relating to the reasonable doubt standard, we suggest caution in the use of such language as it may provide a basis for confusion and may be misinterpreted by jurors as unwarrantedly shifting the burden of proof to the defense. While we would agree with the appellant that the "hesitate to act" language suggested in 1 DEVITT & BLACKMAR, FEDERAL JURY PRACTICE & INSTRUCTIONS § 11.14 (3d ed. 1979) and included in the Federal Judicial Center Committee to Study Criminal Jury Instruction, PATTERN CRIMINAL JURY INSTRUCTIONS 6 (1985) would be preferable, we do not find that the use of the "real possibility" language in this case constituted reversible error.[3]

### CONCLUSION

We reverse and remand to the district court for a new trial.

If on the other hand you think there is a *real possibility* that he is not guilty, you must give him the benefit of the doubt and find him or her not guilty.

3. The government, in a petition for rehearing, requests that we instruct the trial judge as to the charge which should be given to the jury upon a retrial. The government urges that "the jury should be instructed that it should consider the psychiatric testimony only insofar as it relates to the issue of whether or not McBride's brain injury deprived her of the capacity either to know that she was involved in a scheme to launder stolen treasury checks, or to be aware of a high probability that she was so involved." We decline to grant this request on the ground that it would constitute an advisory opinion.

Tr. at 842. (emphasis added).