UNITED STATES of America, Appellee,

v.

**Ojiabo ONUMONU, Defendant–Appellant.**

**No. 695, Docket 91–1278.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1992.

Decided June 24, 1992.

Leonard J. Levenson, New York City, for defendant-appellant.

Mark O. Wasserman, Asst. U.S. Atty., E.D.N.Y., New York City (Andrew J. Maloney, U.S. Atty., Susan Corkery, and Peter A. Norling, Asst. U.S. Attys., of counsel), for appellee.

Before: KAUFMAN *, PRATT, and MINER, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

We have recently seen a significant increase in alimentary-canal drug smugglers who, by swallowing drug-filled condoms, use their bodies to shield illegal drugs from the eyes of customs inspectors. Because of this unusual practice, our courts have been faced with novel legal issues in guiding law enforcement officials who seek to discover and apprehend the smugglers. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538–39, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985) (discussing legislative attempts to address "desperate practice [that] appears to be a relatively

---

* This appeal is being determined by Judges Pratt and Miner. Judge Kaufman, who was a member of this panel and who had prepared to decide the case, unfortunately died on February 1, 1992, before he had an opportunity to vote on this disposition. Because both of the remaining panel members agree and neither has requested the designation of a third panel member, they have determined this appeal pursuant to local rule § 0.14(b).

recent addition to the smugglers' repertoire of deceptive practices"); *United States v. Esieke*, 940 F.2d 29, 33 (2d Cir.) (referring to "the unique problems presented by the advent of alimentary canal smuggling"), *cert. denied*, —— U.S. ——, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991).

Ojiabo Onumonu, another accused "balloon swallower", was convicted by a jury in the United States District Court for the Eastern District of New York, Raymond J. Dearie, *Judge*, of knowingly importing heroin into the United States in violation of 21 U.S.C. § 952(a), and of knowingly possessing heroin with an intent to distribute in violation of 21 U.S.C. § 841(a). Judge Dearie sentenced him to concurrent terms of 66 months' imprisonment, plus the mandatory special assessment.

At trial, Onumonu did not deny bringing contraband into the United States. His only defense was that he believed that the condoms he had swallowed had contained packets of diamonds, not heroin. In short, he claimed he did not have the requisite intent to be convicted of the knowing importation and possession of heroin.

On appeal Onumonu argues that the district court erred when it excluded the testimony of his expert regarding the prevalence and feasibility of internally smuggling diamonds into this country. He also asserts that the 83 condoms containing heroin that he passed as a result of his bowel movements should have been suppressed, because the government agents had illegally seized and detained him. Finally, Onumonu challenges his guideline sentence.

While we hold that the district court correctly denied Onumonu's motion to suppress the contraband, we conclude that it erred in excluding the expert testimony proffered by Onumonu on the subject of diamond smuggling from Nigeria to this country. Because we are reversing Onumonu's conviction for this evidentiary ruling, which we conclude was an abuse of discretion, and because we are remanding for a new trial, we do not reach the sentencing issue.

## BACKGROUND

A native of Nigeria, Onumonu is a permanent resident alien who, at the time of his arrest, had lived in the United States for sixteen years. After a trip to Nigeria, Onumonu returned on Nigeria Airway Flight 850 to John F. Kennedy International Airport in the early morning hours of August 8, 1990. As he walked through the airport's International Arrivals Building, Onumonu approached a plainclothes customs inspector, Glenn Washington, who is a member of the Customs Service's Contraband Enforcement Team which, as Washington testified at trial, "target[s] individuals who may be trying to smuggle narcotics into the United States." When Onumonu asked Washington for help in locating the areas where he could be cleared through customs, Washington identified himself as a customs official and told Onumonu that he would assist him.

As he observed Onumonu, however, Washington grew suspicious. Onumonu sweated profusely, even though "it wasn't particularly warm" in the air-conditioned International Arrivals Building, and his hands were shaking when he presented his passport and customs declaration. Washington noted that Onumonu had paid cash for his one-way ticket from Nigeria to New York. Asked about his travel plans, Onumonu said he had traveled to Nigeria for his stepfather's funeral and that he planned to return to Detroit after he cleared customs, yet he had no airplane ticket to Detroit, nor hotel reservations in New York. Washington found Onumonu's answers to questions to be vague and evasive, and noted that during their conversation, Onumonu failed to make eye contact.

Washington escorted Onumonu into a search room and conducted a pat-down search. When this failed to reveal any contraband, Washington told Onumonu that he believed him to be an internal drug carrier who was bringing narcotics into the United States. Onumonu declined the opportunity to undergo an x-ray.

At this point Washington administered Miranda warnings to Onumonu and escort-

ed him to a mobile medical van located at the airport so that customs agents could monitor Onumonu's bowel movements. In the medical van, the agents had Onumonu take off his clothing, put on a medical gown, and lie down on a bed, to which they shackled him by one hand and one leg.

After four days in the medical van, Onumonu had a bowel movement and passed a few condoms that, according to inspector Melvin Pincus contained hard, opaque, hollow containers which held a substance that field-tested as heroin. Pincus then administered Miranda warnings and placed Onumonu under arrest. After two more days, Onumonu had passed a total of 83 condoms containing similarly-packaged heroin. The total amount of heroin was 576 grams, which had a wholesale value of $100,000.

After Onumonu had purged all the contraband from his system, special customs agent Robert F. Geier questioned him. Onumonu told the agent that, while he was in Nigeria, he had met an acquaintance who offered him $5,000 to swallow the condoms which, the acquaintance told him, were filled with diamonds.

At one point during this interrogation, agent Geier weighed the heroin and called out a gross weight of 787.4 grams to another agent who was filling out a report. Upon hearing this, Onumonu said, "They told me it was 500 grams." In summation, the government argued, based on the expert testimony of special agent Geier, that this statement demonstrated that Onumonu knew the contraband was heroin, because "grams" is a term used in conjunction with the measurement of illegal narcotics.

■ Before trial, Judge Dearie authorized Onumonu to retain, at government expense, an expert witness, a gemologist by the name of Samuel Beizer, who was chairman of the Jewelry Design Institute at New York City's Fashion Institute of Technology. Onumonu's attorney informed the court that Beizer would testify about: 1) the feasibility of smuggling diamonds by ingesting them in the same manner that drug smugglers swallow their contraband; 2) the value of the amount of diamonds that could have been concealed in

the 83 condoms Onumonu had swallowed; 3) the amount of duty that someone would have to pay to legally import those diamonds from Nigeria; and 4) the substantial profit to be derived from smuggling diamonds from Nigeria.

In a letter attached to a pretrial memorandum in support of this proposed expert testimony, Beizer elaborated upon this information. He noted that "[i]t has been established that 90% of * * * all diamonds shipped out of West Africa to Europe and the United States are smuggled"; that diamonds from West African diamond mines that would be worth $1.2 to $2.4 million, if of average quality, and up to ten times that amount, if of high quality, could have been secreted in the 83 "packets" that Onumonu had smuggled into the United States.

Shortly before trial, the government moved to exclude the expert's testimony, claiming that it was irrelevant. The government argued, in classic question-begging form, that the testimony was irrelevant to Onumonu's knowledge of the actual contents of the condoms, because "the defendant, whether or not he was aware of it, was dealing with narcotics smugglers rather than diamond smugglers."

Despite this failure in logic, Judge Dearie reserved decision on the government's motion to exclude the testimony, and the trial began. In his opening statement, Onumonu's counsel conceded the bulk of the government's case and promised the jury that Onumonu would testify and explain why he thought he was smuggling diamonds. Counsel further promised to present evidence as to the prevalence of, and reasons for, diamond smuggling out of Nigeria and as to the feasibility of smuggling diamonds in condoms. With these promises, counsel sought to establish in the jury's eyes the reasonableness of Onumonu's belief that he had swallowed diamonds, not heroin.

After the government concluded the direct examination of its first witness, however, Judge Dearie announced that he was granting the government's motion to exclude the testimony of Onumonu's gemolo-

gist. The court's complete explanation for its ruling was as follows:

> [I]t seems to me one of the issues, one of the bases for my ruling is simply that, to the extent any of this is relevant, and there is a principal flaw in the argument, is the lack of relevancy.
>
> To the extent that any of these may be relevant, you may be able to extract the information to lead to most of your client's testimony from a number of witnesses.
>
> It doesn't require the calling of [Mr. Beizer] from the Fashion Institute of Technology.
>
> I don't think he would offer the kind of testimony that I'm referring to.
>
> This witness [customs inspector Washington] has already testified that he's looking for contraband, drugs, but not to the exclusion of other contraband.
>
> There is some comfort you derive from the fact, as we all know, people smuggle all kinds of things.

Judge Dearie's explanation is not altogether clear, but he apparently grounded his exclusion of Beizer's expert testimony on four different considerations. First, "lack of relevancy". Second, to the extent that the expert testimony might be relevant, it could be extracted from other witnesses. Third, in addition to narcotics, customs inspectors look for other contraband as well. And finally, "as we all know, people smuggle all kinds of things."

## DISCUSSION

### A. *Exclusion of Expert Testimony*

■ We recognize at the outset that the district court has great latitude in deciding whether to admit or exclude expert testimony, and that a district court's decision to exclude expert testimony is to be reviewed under the abuse-of-discretion standard. *See United States v. Dwyer*, 539 F.2d 924, 927 (2d Cir.1976); *see also United States v. McBride*, 786 F.2d 45, 49 (2d Cir.1986). Such broad discretion in making evidentiary rulings, however, "does not mean immunity from accountability". *Dwyer*, 539 F.2d at 928. Therefore, we

may reverse a conviction based on the trial court's exclusion of expert testimony if we conclude that the trial court's decision is " 'manifestly erroneous'." *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (Friendly, J.) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

Expert testimony must be relevant, *see* Fed.R.Evid. 401, 402, but even relevant expert testimony, like all relevant evidence, may be excluded under Fed.R.Evid. 403, if its probative value is outweighed by the danger that it would confuse the jury, be unfairly prejudicial, cause undue delay, waste judicial resources, or be cumulative. *See* Fed.R.Evid. 403. Thus, where relevant testimony from a qualified expert would help a jury determine a fact in issue, and where the testimony does not fall under one of the rule 403 exceptions, such testimony should normally be admitted where the district court fails to provide "a legitimate basis for excluding the proffered evidence." *McBride*, 786 F.2d at 51.

### 1. Rule 401—Relevance

■ We first assess the relevance of the proffered testimony. All relevant evidence is admissible unless excluded because of the constitution, a statute, or a rule. *See* Fed.R.Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. As the government accurately notes, Onumonu's subjective belief was the critical issue in this case where Onumonu had conceded the objective, physical facts, and the prosecution had the burden of proving only that Onumonu "knowingly or intentionally import[ed]" the heroin. *See* 21 U.S.C. §§ 952(a), 960(a)(1).

Onumonu testified that his friend and fellow tribesman, Michael Amparo, had asked him to swallow diamonds and carry them on his flight from Nigeria into the United States for $5,000. When Onumonu

agreed, his friend presented him with a thick soup made of okra, which was slippery and resembled a native dish, "foo-foo". Lubricated by the "foo-foo", the small, hard, opaque packages inside the condoms were easily swallowed. Onumonu testified that he believed that the packets in the condoms contained diamonds. In order to corroborate this testimony and to relate it to both the physical and economic realities of doing what Onumonu testified he believed he was doing, Onumonu proffered the expert testimony of gemologist Beizer. In the context of this case, that testimony certainly met the relevancy standard of rule 401 because it made the existence of Onumonu's belief about diamonds more probable than it would have been without the evidence.

In short, the critical fact in issue here was whether Onumonu actually believed that diamonds, rather than narcotics, were inside the condoms. Relevant to that issue were two questions: whether diamonds could have physically been concealed in the packets, and whether it made any economic sense to smuggle diamonds in that fashion. On both points Onumonu's expert was prepared to testify, and the testimony, contrary to the district court's finding, was relevant to the central issues of the trial.

Even if he had found the evidence to be relevant, Judge Dearie could still have excluded the expert testimony if it fell under any of the rule 403 exceptions. The district judge has discretion to exclude relevant expert testimony if "its probative value is substantially outweighed by its prejudicial effect, or that its admission would confuse the issues, or create needless delay or waste of judicial resources." *McBride*, 786 F.2d at 50. Judge Dearie made no reference to rule 403, and our review of the record leads us to conclude that the evidence could not be excluded under that rule.

First, the proposed testimony of the expert Beizer could not be termed unfairly prejudicial, as Judge Dearie permitted Onumonu himself to testify as to diamond smuggling. Second, it is unlikely that Beizer's straightforward testimony regard-

ing diamond smuggling would have confused or misled the jury, given the narrow question of Onumonu's intent that was before the jury. Third, there is no indication that Beizer's testimony would in any way have unnecessarily delayed the proceedings. Finally, as to the cumulative nature of the testimony, Beizer was the only defense witness—aside from the defendant—who could testify as to diamond smuggling. Given Beizer's expertise and impartiality when contrasted with Onumonu's own self-serving statements, his proposed testimony could hardly be characterized as cumulative.

Thus, the proposed expert testimony was relevant and did not fall under any of the rule 403 exceptions to admissibility.

### 2. Rule 702—Assisting the Trier of Fact

Even though relevant and not subject to the rule 403 exceptions, the proffered expert testimony was not admissible unless it constituted "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue". Fed.R.Evid. 702. The government contended that Beizer's testimony would not have assisted the jury, because, it argued, diamond smuggling from Nigeria is well known to the average juror in New York. The government has provided no basis for this assertion.

In assessing whether expert testimony will assist the trier of fact in determining a fact in issue, we have recognized the usefulness of many different types of expert testimony, and the district court's "broad discretion" in deciding whether to admit or exclude expert testimony. *See United States v. Tutino*, 883 F.2d 1125, 1134 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). We have repeatedly held, for example, that "the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702." *Id.* (citing cases upholding admissibility of expert testimony regarding drug-trade jargon). *See also United States v. Khan*, 787 F.2d 28, 34 (2d Cir.1986) (expert testimony about price of

heroin in Pakistan "falls within [the] broad category" of proper subjects for expert testimony about drug dealer operations).

The government took advantage of these precedents during Onumonu's trial when it introduced agent Geier's expert testimony to establish that drug dealers use "grams" as a unit of weight to measure heroin, and when it argued in summation that when Onumonu said, "They told me it was 500 grams", he must have known he had smuggled heroin, and not diamonds. Nevertheless, the government ironically seeks to prevent Onumonu from presenting his own expert testimony about the prevalence of diamond smuggling and the feasibility of smuggling diamonds in condoms.

As pointed out by the Advisory Committee note to Fed.R.Evid. 702,

> [t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

While the average juror in the New York metropolitan area may be familiar with "the purported methods of Washington Heights drug dealers", *United States v. Castillo*, 924 F.2d 1227, 1231 (2d Cir.1991), and the likelihood of a "commission" being paid to the broker in a kickback scheme, *see United States v. Long*, 917 F.2d 691, 702 (2d Cir.1990), we think it likely that the average New York juror knows little about diamond smuggling out of Nigeria, and even less about the feasibility of internally smuggling diamonds by swallowing condoms.

We conclude, therefore, that the proffered expert testimony regarding diamond smuggling from Nigeria into the United States and the feasibility and profitability of smuggling diamonds in the alimentary canal was relevant and would have assisted the jury in resolving the only contested issue in the case, namely, whether Onumonu believed that the hard opaque packets in the condoms he swallowed contained diamonds rather than heroin. The district court's exclusion of this highly relevant expert testimony critical to Onumonu's defense, and its subsequent failure to provide any colorable reason to justify the bar of the testimony, constituted an abuse of discretion. *Cf. Dwyer*, 539 F.2d at 928 (trial court's decision to exclude psychiatric expert's testimony crucial to defense, coupled with failure to provide reasons for its discretionary ruling, was abuse of discretion); *McBride*, 786 F.2d at 51 (district court's failure to provide "legitimate basis" for excluding psychiatric expert's testimony crucial to the defense was abuse of discretion).

Our inquiry, however, cannot stop with our determination that the expert testimony was admissible and that its exclusion was error. We must also decide whether the evidentiary error affected "a substantial right of the party", Fed.R.Evid. 103(a), where the district court, as here, made a nonconstitutional error in the exclusion of testimony. As with cases where the district court erroneously admitted testimony, the district court's erroneous exclusion of testimony is subjected to harmless-error analysis. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 683–84, 106 S.Ct. 1431, 1437–38, 89 L.Ed.2d 674 (1986) (holding that constitutionally improper denial of defendant's opportunity to impeach witness is subject to harmless-error analysis).

In *McBride*, 786 F.2d at 51, for example, we reversed the defendant's conviction where the district court had excluded the testimony of a psychiatrist, who was the only witness that the defendant sought to present and who planned to testify as to the defendant's mental capabilities at the time of the crime. *Id.* at 49. We noted that "the excluded evidence was critical to appellant's defense", *id.* at 50, and that the district court failed to provide a "legitimate basis for excluding the proffered evidence." *Id.* at 51.

Similarly, we reversed in *Dwyer*, 539 F.2d at 928, where the district court excluded the psychiatric expert but refused to provide reasons for this ruling. Again, we noted that the testimony was critical to the

defense and, given the district court's failure to provide a basis for its discretionary ruling, its exclusion constituted an abuse of discretion. *Id.* In assessing the harm that arose from the exclusion of the expert testimony, we noted that it "may well be that [the] expert opinion, added to the lay testimony already before the jury, would have produced a different verdict." *Id.*

In Onumonu's case, we conclude that it may well be that Beizer's testimony "would have produced a different verdict." The jury was promised in Onumonu's opening statement that they would hear evidence about diamond smuggling in Nigeria, its economic significance and how it could be done. But Judge Dearie's ruling, which did not come until *after* a witness had testified, precluded the promised testimony. At the end of the case, all Onumonu had been able to present was his own belief about diamonds, based solely on his own testimony as to what his friend, Michael Amparo, had told him. A major thrust of the prosecutor's summation was that Onumonu's story was "ludicrous", with the government arguing that no one would smuggle diamonds in this fashion.

While it is difficult to assess the degree of additional harm to the credibility of Onumonu's case caused by the timing of the ruling, we are satisfied, on the record as a whole, that excluding this relevant expert testimony that deprived Onumonu of a fair opportunity to present his case to the jury was not harmless error, and had a substantial effect on the jury's verdict. We therefore reverse the judgment of conviction and remand for a new trial.

B. *Denial of Suppression Motion*

Since there will be a new trial, it is appropriate for us to pass on Onumonu's challenge to Judge Dearie's denial of his suppression motion. Onumonu sought to exclude from evidence all statements and physical evidence obtained from his seizure at the airport and his subsequent detention in the government's medical monitoring van. For the following reasons, we conclude that Judge Dearie did not err in allowing the admission of this evidence.

First, Onumonu claims that customs inspector Washington did not have the reasonable suspicion necessary to detain Onumonu in what is known as "border search status". *See United States v. Odofin,* 929 F.2d 56, 58 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 154, 116 L.Ed.2d 120 (1991). The Supreme Court set forth the standard for such detentions under the fourth amendment in *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 3310–11, 87 L.Ed.2d 381 (1985):

> [T]he detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and [his] trip, reasonably suspect that the traveler is smuggling contraband in [his] alimentary canal.

Just as they did in *Montoya,* the facts here support inspector Washington's reasonable suspicion that Onumonu was smuggling drugs into the United States. *See id.* at 542, 105 S.Ct. at 3311. The issue here is not, as Onumonu frames it, whether there was less cause for reasonable suspicion than in some of our other internal smuggling cases, *see, e.g., Odofin,* 929 F.2d 56; *Esieke,* 940 F.2d 29; the issue is whether reasonable suspicion existed in this case, and we conclude that it did.

The factors justifying the decision to detain the defendant in *Esieke* are similar to those relied on by inspector Washington in deciding to detain Onumonu. Like Esieke, Onumonu displayed nervousness; Washington observed that Onumonu's hands were shaking and that he sweated profusely, despite his being in an air-conditioned building. Like Esieke, Onumonu was traveling from Nigeria "which, according to the government, is a source country for narcotics". *Esieke,* 940 F.2d at 34. And, like Esieke, Onumonu declined to be x-rayed. *Id.*

It is true, as Onumonu points out, that the *Esieke* agents performed a computer search that revealed that "an individual with Esieke's name and date of birth was suspected of narcotics smuggling", *id.,* while the agents here did not find such

information about Onumonu. Nevertheless, the other factors are sufficient, in our view, to establish reasonable suspicion.

■ Second, Onumonu asserts that his four-day incommunicado stay in the medical van before passing the first two condoms containing heroin constituted an unreasonable detention. Onumonu is correct in observing that our decision in *Esieke*, issued after Onumonu's arrest and trial, imposed more stringent requirements on federal law enforcement officials who seek to detain alimentary-canal smugglers, for there we required that any governmental agency overseeing border detentions of suspected alimentary-canal smugglers

> shall inform the local U.S. Attorney within 24 hours of its decision to detain a suspected alimentary canal smuggler. In turn, the U.S. Attorney shall immediately notify a United States Magistrate Judge and detainee's legal counsel (or the Legal Aid Society) of the ongoing detention.

*Id.* at 36. While the *Esieke* court set down these guidelines for future seizures, it did not apply them to the defendant in that case.

Here, the customs authorities did not meet the *Esieke* standards; for example, they did not secure judicial authorization for the detention within 24 hours. *Esieke*, however, was decided *after* Onumonu's trial, and it is clear from the *Esieke* court's opinion that the announced rule was to be prospectively applied. *Id.* Thus, at the time of Onumonu's detention the authorities were not required to seek judicial approval at any particular time. Moreover, while Onumonu's conditions of confinement—including the shackling of one leg and one hand to a bed—seem harsh, they are strikingly similar to the detention conditions that we tolerated in *Esieke*. *Id.* at 35.

Onumonu also argues that his length of detention—four days until he passed the first condoms and was formally arrested—was unreasonable. *Esieke* ameliorates the problem of travelers being detained incommunicado for several days by requiring judicial authorization after the first twenty-four hours of detention. Nevertheless, a suspect may constitutionally be detained "until their bodily processes dispel the suspicion that they will introduce a harmful agent into this country." *Montoya*, 473 U.S. at 544, 105 S.Ct. at 3312. Once reasonable suspicion was established, the governmental authorities could detain Onumonu until he demonstrated, through his bowel movements, that the suspicion was either confirmed or unwarranted. We recognize Onumonu's discomfort, but it is undeniably true that the length of his detention and of his discomfort "resulted solely from the method by which [he] chose to smuggle illicit drugs into this country." *Id.* Given the facts of this case, and because it occurred before *Esieke*, we conclude that Onumonu's four-day detention was reasonable. Consequently, Judge Dearie was correct in denying the motion to suppress and in allowing the challenged evidence and statements to be admitted at trial.

## C. *Sentencing Issue*

Onumonu also challenges Judge Dearie's application of the sentencing guidelines in the imposition of sentence. Specifically, he asserts that Judge Dearie erred in adding to his base offense level two points for obstruction of justice, because of his testimony at trial, implicitly found by the jury to be false. *See* U.S.S.G. § 3C1.1. Because we are reversing Onumonu's conviction and remanding for a retrial, the sentence is automatically vacated and we need not address this difficult issue. We note that in *United States v. Dunnigan*, 60 U.S.L.W. 3798, — U.S. —, 112 S.Ct. 2272, 119 L.Ed.2d 199 (U.S.1992), the Supreme Court has granted certiorari to consider this very question.

## SUMMARY AND CONCLUSION

While the evidence taken from Onumonu during his detention in the police van was properly admitted at trial, the district court abused its discretion when it excluded Onumonu's proffered expert testimony about the prevalence of diamond smuggling out of Nigeria, and about the physical and eco-

nomic feasibility of smuggling diamonds in swallowed condoms.

We reverse the judgment of conviction and remand for a new trial.