SORONDO, Judge.
Appellee, Christian Chiejina (defendant), was charged with trafficking in heroin. The state appeals from an order of the trial court suppressing 1.31 pounds of heroin seized following an eight day warrantless detention of defendant, based upon the conclusion that the length of the detention was unreasonable. We reverse.
The facts of this case are particularly repugnant, however we are compelled to address them in detail as they are essential to our analysis. At the suppression hearing, the state presented the testimony of Senior Customs Officer Nicholas Orlandi (Orlandi). Orlandi testified that on May 14, 1996, he was working at Miami International Airport when he was asked by a Customs supervisor to interview defendant, who had arrived on a flight from Jamaica. Defendant told Orlandi that he was an architect and a native of Nigeria, who lived in New York and worked as a taxi dispatcher. He stated that he had gone to Ecuador to visit a girlfriend and then to Jamaica to visit friends. Orlandi testified that both Ecuador and Jamaica were “source countries” for drugs. Defendant carried a passport and credit cards, but only $20 in cash. Based on this information and his training and experience, Orlandi suspected that defendant was carrying narcotics in his alimentary canal. Defendant was read his Miranda[1] rights and asked to allow an x-ray to be taken of his stomach. He refused to waive his rights or be x-rayed. Orlandi testified this behavior was further indicative that *749 defendant was a “swallower” because in his experience a person who was not a smuggler would waive his rights and allow the x-ray. Defendant further aroused Orlandi’s suspicion by suddenly, and for no apparent reason, asserting that he was tired and then lying down on the floor.
Defendant was taken into custody and transported to Ward D at Jackson Memorial Hospital. Once at Ward D, suspected swal-lowers are asked to walk because exercise usually stimulates a bowel movement. Or-landi testified that defendant initially refused to walk about, refused consent for medical service in the event of an emergency and refused to eat, asserting that the nurse was trying to poison him. Defendant later ate very small amounts of dry cereal in the morning and drank sips of water.
During the first few days at Ward D, defendant soiled his pants and was given fresh clothing three or four times a day. This was indicative of the fact that defendant was actually squeezing liquids out of his rectum, while not moving his bowels. Defendant continued to refuse to eat in order not to have a bowel movement. Orlandi testified that at one point defendant blew his nose and upon inspection of the tissue feces was observed, which was indicative of the fact that defendant had passed some drugs and then re-swallowed them. After it became apparent that defendant was re-swallowing his feces, he was handcuffed to a wheelchair. On May 21, 1996, seven days after defendant was detained, he passed nine pellets of heroin. Thereafter, he had several more bowel movements until he passed a total of thirty-eight pellets of heroin.
Defendant testified that after the first night of his detention he was handcuffed to a wheelchair twenty-four hours a day. He was not allowed to go to the restroom and was given a bedpan. Defendant testified that he slept in the wheelchair and was only allowed to shower twice, once while handcuffed and once without the handcuffs. Defendant denied eating his fecal matter or blowing his nose as described.[2]
The trial court found that the initial stop and detention of defendant was reasonable. However, the court found that the prolonged, eight-day detention was unreasonable as it was one of a particular offensive manner and done without judicial approval or extraordinary circumstance to justify the lengthy delay. As such, the court suppressed the heroin.
We begin our analysis by noting that a traveler’s expectation of privacy is less at the border than in the interior, and “the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.” United States v. Montoya de Hernandez, 473 U.S. 531, 539-40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). “[T]he detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and [his] trip, reasonably suspect that the traveler is smuggling contraband in [his] alimentary canal.” Id. at 541, 105 S.Ct. 3304.
The defendant in this case arrived from Jamaica, was a native of Nigeria, and had traveled through Ecuador. All three of these nations are “source countries” for narcotics. Although defendant had a passport and credit cards, he carried only twenty dollars in currency. Orlandi testified that this was consistent with a swallower who was a U.S. resident, as they are often paid here and thus travel with little cash. Orlandi’s suspicion was heightened further when defendant refused a request that he submit to an x-ray examination. This refusal is significant as “an x-ray examination ... would have easily determined whether the reasonable suspicion that [the defendant] was concealing contraband was justified.” Id. at 545, 105 S.Ct. 3304 (Stevens, J., concurring); United States v. Odofin, 929 F.2d 56, 59 (2d Cir.1991)(“It is the experience of Customs Officials that almost all people who refuse to be x-rayed by them are carrying narcotics internally”); see also United States v. Onumonu, 967 F.2d 782 (2d Cir.1992); United *750 States v. Esieke, 940 F.2d 29 (2d Cir.1991); United States v. Mosquera-Ramirez, 729 F.2d 1352 (11th Cir.1984). Thereafter, in the midst of the customs investigation, defendant quite peculiarly asserted that he was tired and wanted to lay down on the airport floor. Taken in their totality, these facts supported a reasonable suspicion that defendant was an alimentary canal smuggler. See Montoya de Hernandez, 473 U.S. at 541-42, 105 S.Ct. 3304; Onumonu, 967 F.2d at 789 (evidence that defendant was nervous, sweating profusely, traveling from a source country and declined to be x-rayed was sufficient to establish reasonable suspicion of alimentary canal smuggling). As such, the trial court correctly determined that defendant’s initial detention was reasonable.
We turn to the trial court’s evaluation of the propriety of defendant’s continuing detention and conclusion that its length and nature rendered it unreasonable. We recognize that circumstances may arise that could render a traveler’s continued detention an unreasonable seizure, and therefore unconstitutional. However, where a traveler at the border is reasonably suspected to be an internal drug carrier and refuses to consent to an x-ray examination without any medical justification, it is permissible to detain the suspect “until [his] bodily processes dispel the suspicion that [he] will introduce a harmful agent into this country.” Montoya de Hernandez, 473 U.S. at 544, 105 S.Ct. 3304; see also Onumonu, 967 F.2d at 784-85 (approving six day detention; four days until defendant passed first condoms containing heroin); Odofin, 929 F.2d at 58 (approving twenty-four day detention before bowel movement); United States v. Henao-Castano, 729 F.2d 1364, 1366 (11th Cir.1984); but see United States v. Adekunle, 980 F.2d 985, 990 (5th Cir.1992)(approving total detention of over four days, with over two days before first heroin-filled balloon was passed, but announcing prospective rule that agency overseeing detentions must inform prosecuting attorney within 24 hours of its decision to detain a suspected smuggler, who must in turn immediately notify a judge and the detainee’s counsel of the continued detention); United States v. Esieke, 940 F.2d 29, 36 (2d Cir.1991)(same).[3]
In this case, the length and nature of defendant’s eight-day detention resulted solely from the extreme evasive actions he took — -refusing to eat and walk about, desperately avoiding having a bowel movement, and even swallowing his own feces. While the length of the detention and the unsavory events that followed may be “offensive,” as characterized by the trial court, it is equally apparent that the defendant alone was responsible for his situation and that he was, at all times, capable of ending the ordeal by consenting to an x-ray or by simply allowing nature to take its course. Accordingly, we conclude that the trial court erred in finding that defendant’s continued detention was unreasonable. See Montoya de Hernandez, 473 U.S. at 543-44, 105 S.Ct. 3304; Onumonu, 967 F.2d at 790.
The trial court’s order granting defendant’s motion to suppress evidence is reversed and the matter is remanded for trial.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. While the trial court noted a portion of the defendant’s testimony in its order, it made no credibility determination. The state presented rebuttal testimony from Orlandi, who testified that the defendant was allowed to sleep in a bed every night and was only handcuffed to the wheelchair after he started re-swallowing what he was excreting.

. Our research reveals that no other United States Circuit Court of Appeals has followed Ade-kunle or Esieke. Since these cases were decided, the Eleventh Circuit Court of Appeals has addressed the detention issue in United States v. Rodriguez, 74 F.3d 1164 (11th Cir.1996), and stated:
Once reasonable suspicion exists that a person entering the country is an internal drug smuggler, the government may detain the traveler until enough time has passed to allow the contents of the suspected drug smuggler's stomach to be excreted. United States v. Henao-Castano, 729 F.2d 1364, 1366 (11th Cir. 1984). The traveler-suspect often has some control over the length of detention; for exam-pic, he could choose the usually speedier alternative of an x-ray examination.
Id. at 1164-65. Although the Court acknowledged that there “may be limits on how long police can detain a suspected internal carrier,” id. at 1165, it has not adopted the judicial supervision requirement of Adekunle and Esieke. This position is consistent with the United States Supreme Court’s position in Montoya de Hernandez that "the detention of a suspected alimentary canal smuggler at the border is analogous to the detention of a suspected tuberculosis carrier at the border: both are detained until their bodily processes dispel the suspicion that they will introduce a harmful agent into this country." 473 U.S. at 544, 105 S.Ct. 3304.