**UNITED STATES of America, Appellee,**

v.

**Angelina DiDOMENICO, Defendant–Appellant.**

**No. 152, Docket 92–1206.**

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1992.

Decided Jan. 25, 1993.

Sarah A. Chambers, Asst. Federal Public Defender, New Haven, CT (Thomas G. Dennis, Federal Public Defender, of counsel), for defendant-appellant.

Carl J. Schuman, Asst. U.S. Atty., Hartford, CT (Albert S. Dabrowski, U.S. Atty., D. Conn., Andrew P. Gaillard, Asst. U.S. Atty., of counsel), for appellee.

Before: ALTIMARI and McLAUGHLIN, Circuit Judges, and WARD, District Judge.*

McLAUGHLIN, Circuit Judge:

Defendant Angelina DiDomenico appeals from a judgment of the United States District Court for the District of Connecticut (José A. Cabranes, *Chief Judge*), convicting her, after a jury trial, of one count of wire fraud, in violation of 18 U.S.C. § 1343 (Supp.1992), and one count of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 (Supp.1992). On appeal, DiDomenico contends that the district court erred when it refused to admit expert psychiatric testimony relating to her knowledge of whether certain property was stolen. We disagree and affirm the judgment.

## BACKGROUND

More than $5,000 worth of computer equipment was stolen from a professor's office at Yale University. Thomas Parsons, DiDomenico's live-in boyfriend, ac-

---

* Honorable Robert J. Ward, United States District Judge for the Southern District of New York, sitting by designation.

quired this equipment shortly after the theft, and he told DiDomenico that he had some computer equipment he wanted to sell. DiDomenico, at Parsons' suggestion, then telephoned the Boston Computer Exchange, a computer brokerage firm in Massachusetts, where she listed the stolen equipment for sale. During that phone conversation (and on several subsequent occasions) DiDomenico falsely told the Exchange's employees that the equipment belonged to her brother, Peter. When she shipped the equipment to the Exchange for sale she continued to use her brother's name as the sender.

When the Exchange and a prospective buyer received the equipment, they discovered that some of the equipment had no serial numbers. The Exchange's sales manager then telephoned DiDomenico to confront her with this fact, whereupon she claimed that she had bought the equipment from a Jack Scott who, in turn, had purchased it from Computerland, a computer equipment retailer.

The President of the Exchange informed her that the equipment had come from Yale. DiDomenico replied that she was a graduate student at Yale (untrue) on a scholarship (untrue) and she expressed the fear that this incident might affect her status. Throughout these phone conversations, DiDomenico never mentioned her boyfriend's name, and he never spoke to anyone at the Exchange. After these conversations, the Exchange referred the matter to the F.B.I.

DiDomenico was indicted on one count of wire fraud and one count of interstate transportation of stolen property. Before trial, DiDomenico indicated that she would call a psychiatrist, C. Scott Grove, M.D., as an expert witness to testify that she had a "dependent personality disorder with narcissistic features;" and that a dependent personality is a "mental disease, defect, or condition" which appears as a designation in the Diagnostic and Statistical Manual of Mental Disorders, Vol. III, Revised ("DSM–III"). The government responded by filing a motion in limine to exclude the testimony.

At a hearing on the motion, DiDomenico's counsel explicitly acknowledged that Dr. Grove would not testify concerning an insanity or lack of capacity defense. Nor would he testify that DiDomenico had an objective, identifiable organic brain injury. Rather, Dr. Grove's testimony would address the psychological implications of DiDomenico's childhood, her relationship with her parents, her idealization of her boyfriend, Parsons, and her sister's attempted suicide. All this was said to be relevant because it would assist the jury to determine DiDomenico's state of mind during the relevant time period. Counsel denied that Dr. Grove would testify on the ultimate issue of whether DiDomenico knew that the computer equipment was stolen.

Judge Cabranes granted the government's motion, ruling in pertinent part:

> The fact that certain personality traits or conduct may be identified, categorized or characterized by the psychiatric profession by, for example, inclusion in the Diagnostic and Statistical Manual of Mental Disorders (3rd Edition 1980) ("DSM–III") promulgated by the American Psychiatric Association, does not necessarily make the traits or conduct a "mental disease" or "mental disorder" that can be the basis of the defense of insanity, [see, e.g., United States v. Torniero, 570 F.Supp. 721 (D.Conn.1983), aff'd on other grounds, 735 F.2d 725 (2d Cir.1984), cert. denied, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 782 (1985)], much less to be used in the way defendant suggests here.
>
> . . . .
>
> The circumstances presented here suggest that this testimony would be even more problematical than that offered by the defendant in Torniero. We do not have here an objectively ascertainable organic brain injury, as in [United States v. McBride, 786 F.2d 45, 50 (2d Cir. 1986)], the principal case on which defendant relies.
>
> Defendant here claims no such injury, and does not claim insanity, incompetence or other inability to appreciate the nature of these proceedings. The proffered testimony would show her as-

serted vulnerability and susceptibility to being duped by her boyfriend. Expert testimony on this relatively commonplace experience is simply inappropriate. This so-called disorder is surely one of "the host of attitudes and syndromes that are a part of daily living;" "opinion evidence [on such matters] for exculpation or condemnation [goes] beyond the boundaries of current knowledge." [*United States v. Bright*, 517 F.2d 584, 586 (2d Cir. 1975)].

The trial then proceeded and shortly before the government rested its case, DiDomenico moved for reconsideration of the ruling excluding the disputed testimony, this time producing a written report from Dr. Grove. The report responded to Judge Cabranes's conclusion that the DSM–III's recognition of the dependent personality disorder was not significant and did not necessarily make it a mental disease or disorder for purposes of criminal law. Dr. Grove stated that DSM–III distinguishes between personality *traits*, which are universal, and personality *disorders*, which are not, and that DiDomenico's condition was a disorder. The report concluded that "her capacity to recognize ... evidence [that the computer equipment had been stolen] would have been seriously impaired as the direct result of the mental disorder described above." Judge Cabranes remained unpersuaded and excluded Dr. Grove's testimony.

DiDomenico took the stand. She testified that she did not know the equipment was stolen, either when she called the Exchange to list the equipment, or when she later shipped it there. She went on at some length about her lonely childhood, her painful relationship with her uncaring parents, and her relationship with her boyfriend, Tom Parsons. She testified that, at first:

[Parsons] was perfect. He was considerate, kind, he'd open the door for me, he'd make sure that I was comfortable, if I was cold he'd give me his coat. He just did everything right.

And nobody had ever done that for me before. He made me feel special, he made me feel like I mattered.

Even after the relationship soured, and Parsons began to abuse her verbally and physically, DiDomenico could not bring herself to break it off. She testified that:

... I needed him to validate my life. He was, he was the one that was telling me if I was worthy of having, of living, or if I wasn't. He was the primary source of my life. He was, like, my life.

The jury also heard about the effect that her losing a brother in his infancy had on DiDomenico's relationship with Parsons, and the enormous guilt DiDomenico felt over her younger sister's suicide attempt.

Over government objection, Judge Cabranes allowed DiDomenico to call Lisa Valentovish, a Yale University graduate and New Haven alderwoman, who also had a romantic relationship with Parsons. Valentovish testified that she met Tom Parsons in June 1989, some six months after the events at issue in this case, and found him to be intelligent, clean-cut, and sensitive. Moreover, she believed Parsons' stories that he was a U.C.L.A. engineering graduate, and that he owned a Jaguar and some computer equipment. Only after Parsons was arrested for stealing the Jaguar, did Valentovish discover that he had a criminal record, that the computer equipment was probably stolen, and that he had not completed high school but had acquired his knowledge of science from self-study in prison.

After Parsons was released from jail, Valentovish began dating him again. She testified that Parsons preyed upon her sense of guilt and convinced her that the only reason she was reluctant to resume dating was her fear that his criminal record would hurt her political career.

The jury found DiDomenico guilty on both counts of the indictment. Judge Cabranes departed downwardly from the Sentencing Guidelines and imposed a sentence of five years' probation, with the condition that DiDomenico obtain mental health counseling as deemed necessary by the United States Probation Office.

## DISCUSSION

The only issue on appeal is DiDomenico's claim that the district court improperly excluded Dr. Grove's psychiatric testimony relating to her allegedly impaired ability to know that the computer equipment was stolen. She contends that the testimony would have presented an expert basis for her defense that she was manipulated by Parsons and that she lacked knowledge of Parsons' criminal activity.

A district court may admit the testimony of a qualified expert if his knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702 (rev. ed. 1991); *see United States v. Ruggiero*, 928 F.2d 1289, 1304 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991). There has been a palpable ebb and flow in judicial attitudes toward expert testimony, *compare Knight v. Otis Elevator Co.*, 596 F.2d 84, 87 (3d Cir.1979) (noting "the liberal policy of permitting expert testimony which will 'probably aid'" the jury) *with Andrews v. Metro North Commuter R.R.*, 882 F.2d 705, 708 (2d Cir.1989) (expert should not be permitted to testify "to lay matters which a jury is capable of understanding and deciding without the expert's help"). Yet, there has been one recurrent tide coursing through the cases: the admissibility of such evidence is generally best left to trial judges.

Particularly in close cases, like this one, the decision should be left to the trial judge who has his finger on the pulse of the trial and has lived with the jury throughout the case. He has a much better vantage point than an appellate court to decide whether expert testimony will assist the jury or, in the parlance of the gridiron, will just be piling on. For this reason, the call is his and he will be reversed, not because we, if we sat as trial judges would have admitted the testimony, but only when we can conclude that the decision to exclude such testimony is "manifestly erroneous." *United States v. Cruz*, 797 F.2d 90, 96 (2d Cir. 1986); *cf. Eymard v. Pan Am. World Airways*, 795 F.2d 1230, 1234 (5th Cir.1986) ("[W]here the record makes it evident that the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy", "[o]ur message to our able trial colleagues: it is time to take hold of expert testimony in federal trials."). We conclude that the district court was well within the bounds of discretion in excluding Dr. Grove's testimony because the testimony did not meet the helpfulness criterion of Rule 702, *see United States v. Esch*, 832 F.2d 531, 535 (10th Cir.1987) (court refused to allow psychologist to testify that defendant had a "dependent personality"), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242, *and cert. denied,* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988).

■ (1) *Helpfulness.* The testimony consisted of a psychiatric opinion that DiDomenico suffered from a dependent personality disorder. After parsing Dr. Grove's proffered testimony, we find that Judge Cabranes could prudently conclude that such testimony would only complicate the jury's task.

It should be remembered that the district court did admit lay testimony (from DiDomenico and Valentovish) concerning both DiDomenico's emotional state at the time of the crime and Parsons' Svengalian personality. The jury heard testimony that covered virtually the entire ground of Dr. Grove's expert testimony. This sort of evidence was not hard to assimilate and, as Judge Cabranes observed, it addressed a subject matter within the experience of the jury. *See United States v. 31–33 York St.*, 930 F.2d 139, 141 (2d Cir.1991) ("This was a simple question for which the jury needed no help.").

DiDomenico argues, however, that Dr. Grove's testimony would have attached a clinical label of "dependent personality disorder" to her emotional state, and distinguished this from a mere "personality trait." This testimony concerning the psychological implications of her disorder, DiDomenico contends, would have assisted the jury in understanding the evidence, and in determining whether she had the requisite knowledge. Testimony regarding certain mental diseases and defects has been

admitted under Rule 702 in appropriate cases. *See United States v. Freeman*, 357 F.2d 606, 622 (2d Cir.1966) (insanity); *McBride*, 786 F.2d at 50 (organic brain injury). We have held, however, that a district court may exclude psychiatric evidence of a "passive-dependent personality disorder" offered to show lack of knowledge that certain property was stolen. *United States v. Bright*, 517 F.2d 584, 585–86 (2d Cir.1975).

DiDomenico attempts to escape *Bright* by asserting that there the defendant did not claim to be suffering from a mental *disease* or *defect*, whereas here Dr. Grove would have testified that DiDomenico did. The difficulty with this argument is that the mental condition at issue in *Bright* was the same "dependent personality disorder" that DiDomenico alleges here. DiDomenico cannot explain why the disorder in *Bright* was not a mental disease or defect, but in DiDomenico's case the identical condition is. Therefore, we find that the imprimatur of a clinical label was neither necessary nor helpful for the jury to make an assessment of DiDomenico's state of mind. Accordingly, Judge Cabranes appropriately excluded the testimony of Dr. Grove.

■ (2) *Ultimate issue.* There is another evidentiary complication in this case that is not present in most of the other landmark decisions. Although Fed.R.Evid. 704(a) abrogates the common law rule and allows an expert witness to give opinion testimony embracing an ultimate issue in the case, *see Ruggiero*, 928 F.2d at 1304, there is one salient exception: Rule 704(b) prohibits the expert from expressing "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed.R.Evid. 704(b) (rev. ed. 1991). This disables even an expert from "expressly stating the final conclusion or inference as to a defendant's actual mental state" at the time of a crime. *United States v. Richard*, 969 F.2d 849, 854 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992), *and petition*

*for cert. filed*, No. 92–6588 (Nov. 16, 1992); *accord United States v. Schatzle*, 901 F.2d 252, 257 (2d Cir.1990) ("Although the Federal Rules of Evidence do not bar all expert testimony concerning an ultimate issue, *see* Fed.R.Evid. 704, a district court may exclude ultimate issue testimony under Federal Rule of Evidence 702 when it is not helpful to the jury, or under Rule 403 when it may be unduly prejudicial."); *United States v. McBride*, 786 F.2d 45, 50 (2d Cir.1986) ("[A] district court may exclude psychiatric testimony which merely offers an opinion about the defendant's capacity to form the mental state required to commit the offense charged, without suggesting the presence of a mental disease or defect ...").

Dr. Grove's testimony was also properly excluded under Fed.R.Evid. 704(b). The rule recognizes that expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function. *See, e.g., United States v. Blumberg*, 961 F.2d 787, 789 (8th Cir.1992) (the rule forbids experts from telling the jury what its finding should be on the ultimate issue in the case); *United States v. Foster*, 939 F.2d 445, 454 (7th Cir.1991) (testimony "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for them"); *United States v. Brodie*, 858 F.2d 492, 496 (9th Cir.1988) (affirming exclusion of expert testimony which, if admitted, would have impermissibly stated an opinion as to defendants' willfulness, a mental state which is an element of the crime charged); *United States v. Newman*, 849 F.2d 156, 165 (5th Cir. 1988) ("The expert may not offer an opinion on the ultimate issues of whether the defendant was in fact induced to commit the crime or lacked predisposition."); *United States v. Dunn*, 846 F.2d 761, 762 (D.C.Cir.1988) ("It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent."); *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir.) ("expert cannot expressly state a conclusion" as to mental state), *cert. denied*, 486 U.S. 1026, 108

S.Ct. 2003, 100 L.Ed.2d 234 (1988); *see also United States v. Dennison*, 937 F.2d 559, 564–65 (10th Cir.1991) (applying rule to psychiatric expert testimony), *cert. denied*, —— U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

■ Clearly, Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state. *See Richard*, 969 F.2d at 854–55 ("The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state."). The plain language of the rule, however, means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw. *See Alvarez*, 837 F.2d at 1031. While DiDomenico proclaims that she did not offer Dr. Grove to testify as to the ultimate issue of whether she knew the computer equipment was stolen, this is semantic camouflage. We read Dr. Grove's proffered testimony as stating the bottom-line inference, and leaving it to the jury merely to murmur, "Amen." In any event, it was certainly close enough to a violation of Rule 704(b) that, when combined with the trial judge's assessment of helpfulness under Rule 702, amply justified his exercise of discretion to exclude it.

## CONCLUSION

The district court did not err in excluding DiDomenico's proffered psychiatric testimony.

Affirmed.

ROBERT J. WARD, Senior District Judge, dissenting:

I respectfully dissent. Although a district court has broad discretion in deciding whether to admit expert testimony, *United States v. Onumonu*, 967 F.2d 782, 786–87 (2d Cir.1992); *United States v. Dwyer*, 539 F.2d 924, 927 (2d Cir.1976), such decisions are not "immun[e] from accountability," *United States v. Onumonu*, 967 F.2d at 786, and may require reversal of a conviction if the exclusion of expert testimony was " 'manifestly erroneous.' " *Id.* (quot-

ing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (Friendly, J.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986)). Because it is clear that Dr. Grove's psychiatric testimony would have helped the jury to understand the evidence before it, in accordance with Rule 702, Fed.R.Evid., without crossing the line into the evidentiary territory prohibited by Rule 704(b), Fed.R.Evid., I am of the view that the district court's decision to preclude Dr. Grove's testimony was manifestly erroneous. Inasmuch as the preclusion of the expert testimony was not harmless error, I would reverse DiDomenico's conviction and remand for a new trial.

### A. *Rule 702—Assisting the Trier of Fact*

In explaining his decision to preclude Dr. Grove from testifying, Judge Cabranes indicated that:

> [t]he proffered testimony would show [defendant's] asserted vulnerability and susceptibility to being duped by her boyfriend. Expert testimony on this relatively commonplace experience is simply inappropriate. This so-called disorder is surely one of "the host of attitudes and syndromes that are part of daily living; opinion evidence [on such matters] for exculpation or condemnation [goes] beyond the boundaries of current knowledge."

J.App. at 45–46 (quoting *United States v. Bright*, 517 F.2d 584, 586 (2d Cir.1975)). In short, the district court concluded that the proffered expert psychiatric testimony should be excluded because: (1) defendant's experience was "relatively commonplace" and (2) such testimony goes "beyond the boundaries of current knowledge." The district court's reasoning is based largely on the logic in *Bright*, where the Second Circuit wrote:

> In dealing with forensic psychiatry we must be humble rather than dogmatic. The mind and motivation of an accused who is not on the other side of the line under the [insanity defense] test, is, by the judgment of experience, left to the jury to probe. The complexity of the fears and long-suppressed traumatic ex-

periences of a lifetime is in the personality of all of us. All humankind is heir to defects of personality.

. . . .

In short, appellant asks us to go beyond the boundaries of conventional psychiatric opinion testimony. We think the testimony offered was not sufficiently grounded in scientific support to make us reach or, indeed, cross the present frontier of admissibility.

*United States v. Bright,* 517 F.2d at 586.

The panel majority holds that it was reasonable for Judge Cabranes to exclude Dr. Grove's testimony because such testimony would not have been helpful to the jury, pursuant to Rule 702, Fed.R.Evid.[1] The panel majority presents two rationales for why expert testimony in this case would be unhelpful to a jury—because such testimony (1) would be redundant by "piling on" information already available to the jury and (2) would "complicate the jury's task" by providing additional information or clinical labels that might create a source of confusion for the jury.

After reviewing the evidence presented to the jury and the written report prepared by Dr. Grove, I reach a different conclusion; namely that Dr. Grove's testimony would have assisted the jury in determining whether the defendant had guilty knowledge, and is therefore not precluded under Rule 702. I base this conclusion on three factors: (1) psychiatry is an accepted science and, contrary to the district court's conclusion, the ability to identify Dependent Personality Disorder is not "beyond the boundaries of current [psychiatric] knowledge;" (2) rather than supporting the district court's assertion that defendant's alleged mental state was "relatively commonplace," the expert witness would have testified to precisely the opposite point, namely that DiDomenico's Dependent Per-

sonality Disorder was a mental disease or defect that fell beyond "one of the host of attitudes and syndromes that are a part of daily living;" and (3) the jury can be relied upon to evaluate, with a critical eye, psychiatric testimony, such as that which Dr. Grove would have presented, by looking beyond a "clinical label" to ascertain whether the defendant's mental state included guilty knowledge.

### 1. General Acceptance of Psychiatry and Dependent Personality Disorder

The district court and panel majority rely heavily on *Bright,* which was decided nearly eighteen years ago. Since 1975, however, psychiatry, like virtually all fields of medicine, has expanded its boundaries of knowledge considerably, while becoming increasingly sophisticated in its understanding of mental diseases, defects and disorders. Indeed, eleven years after *Bright,* this Circuit wrote, "[i]t cannot be gainsaid that psychiatry enjoys general acceptance in the field of medicine." *United States v. McBride,* 786 F.2d 45, 51 (2d Cir.1986) (citing *Ake v. Oklahoma,* 470 U.S. 68, 81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53 (1985)). As the boundaries of medical knowledge expand, so too must the boundaries of admissible medical evidence.

Like the panel majority, I believe the mental disorder allegedly suffered by DiDomenico was substantially similar to the mental condition that allegedly afflicted the defendant in *Bright.* Unlike the panel majority, however, I do not believe that Dr. Grove intended merely to place a newfangled "clinical label" on DiDomenico's condition. Rather, Dr. Grove was prepared to testify concerning the *effect* of a medical condition which, in the years since *Bright,* has been the subject of considerable research[2] and is now sufficiently well-established to justify inclusion in the standard

---

**1.** Rule 702, Fed.R.Evid., provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**2.** Over 85 articles relating to Dependent Personality Disorder appeared in medical journals from January 1980 through May 1990. R.M.A. Hirschfeld et al., *Dependent Personality Disorder: Perspectives for DSM–IV,* 5 Journal of Personality Disorders 135, 137 (1991).

reference work of psychiatric diagnosis: the Diagnostic and Statistical Manual of Mental Disorders, Third Edition, Revised (hereinafter "DSM–III–R").

Dependent Personality Disorder is listed and defined in DSM–III–R, a publication which is, according to Dr. Grove, the "most respected, standard text on the subject." J.App. at 235. The process by which a disorder qualifies for listing and description in DSM–III–R is rigorous and requires stringent peer review. *See* DSM–III–R at xix–xxii, xxix ("These diagnostic criteria and the DSM–III–R classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field...."). DSM–III–R disorders have gained general acceptance in the academic and clinical psychiatric communities.[3] Furthermore, there is a growing literature on the treatment of Dependent Personality Disorder. *See e.g.,* 3 American Psychiatric Association, *Treatments of Psychiatric Disorders: A Task Force Report of the American Psychiatric Association* 2762–70 (1989). Accordingly, the diagnosis which Dr. Grove was prepared to offer was based on a well-established mental disorder and represented neither "junk science"[4] nor scientific speculation "beyond the boundaries of current knowledge."

The Second Circuit has examined whether expert testimony concerning the presence of an objectively ascertainable organic brain injury may be excluded by the trial judge. The Court ruled that the trial judge erred in not admitting this testimony, noting that,

[a]lthough a district court may exclude psychiatric testimony which merely offers an opinion about the defendant's capacity to form the mental state required to commit the offense charged, without suggesting the presence of a mental disease or defect, the psychiatrist here was prepared to testify that McBride suffered such organic impairment. We believe that, for purposes of determining admissibility, this evidence was highly relevant to a critical fact in issue, namely, appellant's state of mind, and, therefore, was admissible under Fed.R.Evid. 702.

*United States v. McBride,* 786 F.2d 45, 50 (2d Cir.1986) (citations omitted). The question, then, is whether the logic of *McBride* should be extended to situations where the alleged mental disease or defect is not based on an objectively ascertainable organic brain injury, but rather on an admittedly subjective determination by a psychiatrist, using established diagnostic criteria, that an individual suffers from a mental

**3.** Referring to its predecessor edition, DSM–III–R indicates,

The impact of DSM–III has been remarkable. Soon after its publication, it became widely accepted in the United States as the common language of mental health clinicians and researchers for communicating about the disorders for which they have professional responsibility. Recent major textbooks of psychiatry and other textbooks that discuss psychopathology have either made extensive reference to DSM–III or largely adopted its terminology and concepts.

DSM–III–R at xviii.

DSM–III–R and its predecessors do have their critics, among both psychiatric and legal academic commentators. *See e.g.,* Bruce J. Winick, *The Right to Refuse Mental Health Treatment: A First Amendment Perspective,* 44 U.Miami L.Rev. 1, 46 (1989) ("Although the diagnostic criteria for mental illness have become more specific in recent years, particularly [in DSM–III and DSM–III–R], the criteria remain imprecise and value laden."); David Allen Larson, *Mental Impairments and*

*the Rehabilitation Act of 1973,* 48 La.L.Rev. 841, 849–50 (1988) (noting that, while DSM–III "received generally favorable reviews," it was also "a frequent subject of commentary and criticism").

Nevertheless, the fact remains that the DSM series is widely used and relied upon by psychiatrists. For example, "a survey of one hundred and seventy-five diagnostic experts from fifty-two countries spanning the six World Health Organization Regions revealed that ... 72% used DSM–III.... [O]n a scale measuring 'high, medium and low' usefulness, DSM–III was rated as highly useful [by 46% of survey respondents]." Larson, *supra,* at 849.

**4.** "The best test of certainty we have is good science—the science of publication, replication, and verification, the science of consensus and peer review." Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* 228 (1991), *quoted in Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 951 F.2d 1128, 1131 (9th Cir. 1991), *cert. granted,* — U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992).

disorder. I believe that when, as in the present case, a diagnosis is based upon criteria that are sufficiently well-established to justify inclusion in a widely accepted medical manual, such as DSM–III–R, that diagnosis belongs in the courtroom pursuant to Rule 702 every bit as much as evidence of an organic brain injury.[5]

Of particular relevance to this appeal, Dependent Personality Disorder was *not* listed in the second edition of the Diagnostic and Statistical Manual of Mental Disorders, which was current when the *Bright* court wrote, "appellant asks us to go beyond the boundaries of conventional psychiatric opinion testimony. We think the testimony offered was not sufficiently grounded in scientific support to make us reach or, indeed, cross the present frontier of admissibility."[6] 517 F.2d at 586.

When the frontiers of scientific knowledge change, that which is admissible as expert testimony must change as well. At the time of *Bright*, Dependent Personality Disorder was not recognized by the standard treatise of psychiatric diagnosis. Over time, with further research and peer review, Dependent Personality Disorder has now gained acceptance within the psychiatric profession, which, in turn, "enjoys general acceptance in the field of medi-

cine." *United States v. McBride*, 786 F.2d at 51. The testimony proffered by Dr. Grove was, in the words of the *Bright* court "sufficiently grounded in scientific support" and did not "go beyond the boundaries of current knowledge." *United States v. Bright*, 517 F.2d at 586.

### 2. Was Defendant's Alleged Mental State "Commonplace"?

The district court did not believe that expert psychiatric testimony was necessary because the defendant's experience was "relatively commonplace" and one of a "host of attitudes and syndromes that are a part of daily living." J.App. at 46. That view has been adopted by the panel majority of this Court, which writes that Dr. Grove's expert testimony "addressed a subject matter within the experience of the jury."

The medical evaluation prepared by Dr. Grove paints a very different picture. He concludes that the defendant suffers from a severe Dependent Personality Disorder with severe narcissistic features and that this is

a bonafide [sic] mental disorder as defined in the most respected, standard text on the subject, i.e. [DSM–III–R].

---

5. Of course to say that a defendant is suffering from a disorder included in DSM–III–R is not dispositive of the legal matter. As the authors themselves point out:

> The purpose of DSM–III–R is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat the various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency.

DSM–III–R at xxix. As discussed in Section B., *infra,* it is the jury that must ultimately decide the *legal* effect of a defendant's mental disorder.

6. Dependent Personality Disorder made its first appearance in the Diagnostic and Statistical Manual of Mental Disorders in 1980, five years after *Bright:*

| Edition | Year of Publication | Dependent Personality Disorder Included? |
|---|---|---|
| DSM–I | 1952 | No |
| DSM–II | 1968 | No |
| DSM–III | 1980 | Yes |
| DSM–III–R | 1987 | Yes |

DSM–III–R at xviii–xix.

In *Bright*, the psychiatrist was of the opinion that the defendant had a "passive-dependent personality disorder." *United States v. Bright*, 517 F.2d at 586. This disorder was neither listed in DSM–II nor in subsequent editions of the Diagnostic and Statistical Manual of Mental Disorders. Furthermore, the psychiatrist in *Bright* examined the defendant only once before trial, resulting in a "hurried diagnosis." *Id.* In preparing his diagnosis, Dr. Grove spoke with DiDomenico on five separate occasions, for a total of thirteen hours.

That text makes a clear distinction between personality traits and a personality disorder as follows: "Personality traits are enduring patterns of perceiving, relating to, or thinking about the environment and oneself, and are exhibited in a wide range of important social and personal contexts. It is only when personality traits are inflexible and maladaptive and cause either significant impairment ... in social or occupational functioning ... or subjective distress that they constitute Personality Disorders...." Some psychiatrists have asserted that all human beings can be classified as suffering from a mental disorder. *All human beings possess personality traits; indeed, it is the complex of personality traits that make us unique. Not all human beings, however, suffer from a mental disorder....* With regard to this case now before the court, it is my professional opinion that had evidence been available to Ms. DiDomenico to the effect that the computers had been stolen, her capacity to recognize that evidence would have been seriously impaired as the direct result of [her] mental disorder.

Psychiatric Report Prepared by C. Scott Grove, M.D., J.App. at 235–36 (emphasis added).

The panel majority correctly points out that the jury had an opportunity to hear testimony from DiDomenico about her background and relationship with Parsons, as well as testimony from another defense witness, Valentovish, who described the effect Parsons had on women. However, Dr. Grove would have done more than simply elaborate on these facts. Rule 702 provides a dual rationale for the admission of expert testimony: to help the trier of fact (1) "to determine a fact in issue," but also (2) "to understand the evidence." Thus, Rule 702 anticipates that an expert witness will do something more than merely supply facts to the jury. An expert may also assist a jury in *understanding* the evidence before it. That is precisely what Dr. Grove's testimony would have accomplished.

In making a Rule 702 determination, a district court must be guided by the principle that

"[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and *to the best possible degree* the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."

Advisory Committee Note to Rule 702, Fed. R.Evid. (emphasis added) (quoting Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952)), *quoted in United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir.1992). To hear DiDomenico's self-description of her emotional state at the time of her crime, without more, is not to understand "to the best possible degree" how this emotional state might affect her ability to have guilty knowledge. A psychiatrist can provide this "specialized understanding."

Courts now routinely allow psychiatrists and psychologists to enlighten the jury on the effects of mental illness. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for example, the Supreme Court wrote,

[P]sychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and *about the effects of any disorder on behavior;* and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.... Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand.

Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.[7]

*Id.* at 80–81, 105 S.Ct. at 1095 (citation omitted) (emphasis added); *see also Arcoren v. United States,* 929 F.2d 1235, 1239–40 (8th Cir.) (" 'The concept expressed by the Rules is sufficiently broad to embrace psychiatric and psychological testimony from those who possess specialized knowledge concerning mental aberrations in human behavior, when such knowledge will help the jury to understand relevant issues in the case.' " (quoting *United States v. Barta,* 888 F.2d 1220, 1223 (8th Cir.1989)), *cert. denied,* —— U.S. ——, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991)).

Indeed, as one court has noted, in a case dealing with "battered woman syndrome" evidence:

> The difficulty with the expert's testimony is that it sounds as if an expert is giving knowledge to a jury about something that the jury knows as well as anyone else, namely, the reasonableness of a person's fear of imminent serious danger. That is not at all, however, what this testimony is directly aimed at. It is aimed at an area where the purported common knowledge of the jury may be very much mistaken, an area where jurors' logic, drawn from their own experience, may lead to a wholly incorrect conclusion, an area where expert knowledge would enable the jurors to disregard their prior conclusions as being common myths rather than common knowledge.

*State v. Kelly,* 97 N.J. 178, 478 A.2d 364, 378 (1984); *see also State v. Koss,* 49 Ohio St.3d 213, 551 N.E.2d 970, 972 (1990) (noting that most jurisdictions confronted with the issue have allowed expert testimony concerning battered woman syndrome); *State v. Hennum,* 441 N.W.2d 793, 798 (Minn.1989) (same); Susan Murphy, *Assist-*

*ing the Jury in Understanding Victimization: Expert Psychological Testimony on Battered Woman Syndrome and Rape Trauma Syndrome,* 25 Colum.J.L. & Soc. Probs. 277, 297–98 (1992).

For the reasons given above, I believe that Dr. Grove could have assisted the jury in deciding whether defendant's background and mental disorder affected her ability to have guilty knowledge. Without his testimony to establish this alleged causal link, the jury could not "determine intelligently *and to the best possible degree"* the disputed issue in this case, because, as Dr. Grove's written report makes clear, DiDomenico's mental condition was not so "commonplace" that a layperson would understand it.

### 3. The Role of the Jury

The panel majority finds that Judge Cabranes could reasonably conclude that Dr. Grove's testimony would "complicate the jury's task." This conclusion underestimates the intelligence of the jury in general and misreads the jury's well-established role in evaluating expert psychiatric testimony.

As this circuit has recently observed, in deciding that DNA profiling evidence was properly admitted by the trial judge, *"[t]he jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations."* *United States v. Jakobetz,* 955 F.2d 786, 797 (2d Cir.) (emphasis in original) (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 702[03] at 702–36 (1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *cf. United States v. Torniero,* 735 F.2d 725, 734 (2d Cir.1984) ("The framers of the Bill of Rights expected that juries would be capable of resolving disputed issues of fact in the federal courts. Even in civil litigation, where nonperspicuous issues and abstruse evidence proliferate, we have never acknowledged a 'complexity exception' to the right to a jury trial." (citation omitted)), *cert. denied,* 469

---

**7.** Although *Ake* was concerned with psychiatric testimony on insanity, its rationale applies equally to psychiatric testimony which goes to one of the elements of the crime.

U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 782 (1985).

Furthermore, "the jury can be instructed that the expert's opinion is solely for their assistance, and subject to their complete rejection if they consider it unreliable." *United States v. Williams*, 583 F.2d 1194, 1200 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

This faith in the intelligence and good sense of the jury extends to its ability to cast a critical eye on psychiatric testimony. *See Barefoot v. Estelle*, 463 U.S. 880, 901 n. 7, 103 S.Ct. 3383, 3399 n. 7, 77 L.Ed.2d 1090 (1983) ("All of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury. *Petitioner's entire argument ... is founded on the premise that a jury will not be able to separate the wheat from the chaff. We do not share in this low evaluation of the adversary process."*) (emphasis added), *cited in United States v. Torniero*, 735 F.2d at 734.

In the instant matter, the government was free to challenge Dr. Grove's professional qualifications, vigorously cross-examine Dr. Grove as to his diagnosis, or place its own psychiatrist on the stand to testify about Dr. Grove's diagnosis in particular and the effects of Dependent Personality Disorder in general. *See United States v. Williams*, 583 F.2d at 1200. As the Supreme Court has concluded, in the context of an insanity defense:

> Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party.... *By organizing a defendant's mental history, examination results and behavior, and other information,*

*interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them.*

*Ake v. Oklahoma*, 470 U.S. at 81, 105 S.Ct. at 1095 (emphasis added). Moreover, "[t]he mere fact that there may be conflicting testimony by experts is not a sufficient basis to exclude such evidence. Indeed, not uncommonly, there is conflict among experts on most any subject." *United States v. McBride*, 786 F.2d at 51; *see also United States v. Torniero*, 735 F.2d at 734 ("It is the function of the jury to evaluate conflicting evidence and reach a decision on criminal responsibility by applying society's values to the legal issues in dispute. In making this legal and moral judgment, the jury should not be shielded from differences of opinion in a profession [i.e., psychiatry] that can never be entirely devoid of subjective disagreements." (citation omitted)).

Furthermore, precisely because the issue presented in this case deals with human behavior, rather than an area of knowledge totally foreign to most laypersons (e.g. DNA detection technology), the jurors are better able to evaluate any evidence presented by Dr. Grove. As one commentator has argued, "the factfinder must be aware that results in [the fields of psychiatry and psychology] vary with the interpreter. Furthermore, this 'soft science' expertise is less likely to overwhelm the common sense of the average juror than 'hard science' expertise because it is closer to his common understanding and jurors usually recognize the subjectivity of the opinion." Herasimchuk, *A Practical Guide to the Admissibility of Novel Expert Evidence in Criminal Trials Under Federal Rule 702*, 22 St. Mary's L.J. 181, 197–98 (1990).

The panel majority underestimates both the wisdom of the jury and the additional insight into human behavior that a psychiatrist can provide. There is no doubt in my mind that the jury could not, without expert testimony, assess "to the best possible

degree" whether DiDomenico, who was allegedly afflicted with Dependent Personality Disorder, had guilty knowledge. Therefore, I would find the district court's decision to preclude Dr. Grove's testimony under Rule 702 to be manifestly erroneous.

## B. *Rule 704(b)—Opinion on Ultimate Issue of Defendant's Mental State*

The panel majority holds that the district court properly excluded Dr. Grove's testimony pursuant to Fed.R.Evid. 704(b). However, the legislative history of Rule 704(b) makes clear that Congress did not intend to preclude expert testimony of the sort proffered by Dr. Grove. Rule 704(b) maps out a narrowly defined area of impermissible testimony which would inappropriately substitute the judgment of the expert for that of the fact-finder. As outlined by defense counsel, the testimony which Dr. Grove was prepared to present would not have crossed the threshold into that category of evidence which is proscribed by Rule 704(b).

The panel majority rules that the asserted distinction between psychiatric testimony, of the sort offered by Dr. Grove, and the ultimate legal conclusion as to whether the defendant possessed guilty knowledge, which was the province of the DiDomenico jury, is nothing more than "semantic camouflage." This view is inconsistent with the congressional intent behind Rule 704(b), as well as with judicial interpretations of Rule 704(b). In fact, it is just this distinction which Rule 704(b) seeks to establish.

As the Senate Judiciary Committee report indicated, Congress intended that,

> [u]nder [proposed Rule 704(b)], expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been. The basis for this limitation on expert testimony ... is ably stated by the American Psychiatric Association:
>
> > [I]t is clear that psychiatrists are experts in medicine, not the law. As such, it is clear that the psychiatrist's

first obligation and expertise in the courtroom is to "do psychiatry," i.e., to present medical information and opinion about the defendant's mental state and motivation and to explain in detail the reason for his medical-psychiatric conclusions. When, however, "ultimate issue" questions are formulated by the law and put to the expert witness who must then say "yea" or "nay," then the expert witness is required to make a leap in logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between medical concepts and legal or moral constructs such as free will. These impermissible leaps in logic made by expert witnesses confuse the jury....
> >
> > *Psychiatrists, of course, must be permitted to testify fully about the defendant's diagnosis, mental state and motivation (in clinical and commonsense terms) at the time of the alleged act so as to permit the jury or judge to reach the ultimate conclusion about which they and only they are expert....*
>
> Moreover, the rationale for precluding ultimate opinion psychiatric testimony extends beyond the insanity defense to any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven.

S.Rep. No. 225, 98 Cong., 2d Sess. 230–31 (1984) (emphasis added), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412–13. Thus, an expert is not precluded from presenting a *psychiatric/medical* diagnosis, in clinical and commonsense terms, from which a jury might then draw inferences concerning whether a defendant possessed the mental state required for a *legal* finding of guilt. *See United States v. Richard*, 969 F.2d 849, 854–55 (10th Cir.) ("As interpreted, Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental

state."), *cert. denied,* — U.S. ——, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992), *and cert. denied,* — U.S. ——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993); *United States v. Gipson,* 862 F.2d 714, 716 (8th Cir.1988) ("[psychologist] expressed his views in psychological, not legal, terms. This left to the jury its task of independently determining [defendant's] degree of criminal intent"); *United States v. Alvarez,* 837 F.2d 1024, 1031 (11th Cir.) (despite the fact that expert testimony created an "obvious inference ... the expert left this inference for the jury to draw. He did not expressly 'state the inference.' Therefore, his testimony did not violate rule 704(b)"), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2003, 100 L.Ed.2d 234 (1988); *United States v. Dotson,* 817 F.2d 1127, 1132 (5th Cir.) ("As the legislative history indicates, rule 704 prohibits experts from testifying as to the 'ultimate legal issue'—whether the defendant did or did not have the requisite state of mind—yet permits experts to 'present and explain' their diagnosis, that is, their analysis of the facts based on their special knowledge qualifying them as experts."), *vacated in part, reh'g granted in part,* 821 F.2d 1034 (5th Cir.1987); *see also United States v. Dubray,* 854 F.2d 1099, 1102 (8th Cir.1988) ("Diagnoses of 'psychosis,' 'schizophrenia,' or other mental disorders must be made using the methodology and assumptions of psychiatric medicine, which are not necessarily the same as those of the criminal law. Just as the law of insanity does not incorporate the changing and often vague categories of contemporary psychiatric method, psychiatric definitions of psychosis do not necessarily entail the legally significant notions of right and wrong.").

Indeed, "Congress did not enact Rule 704(b) so as to limit the flow of diagnostic and clinical information. Every actual fact concerning the defendant's mental condition is still as admissible after the enactment of Rule 704(b) as it was before. Rather, the Rule 'changes the style of question and answer that can be used to establish both the offense and the defense thereto.'" *United States v. Edwards,* 819 F.2d 262, 265 (11th Cir.1987) (quoting *United States v. Mest,* 789 F.2d 1069, 1071–72

(4th Cir.) *cert. denied,* 479 U.S. 846, 107 S.Ct. 163, 93 L.Ed.2d 102 (1986)).

Furthermore, an expert may testify concerning the effects of mental disease or defect:

> Rule 704(b) was not meant to prohibit testimony that describes the qualities of a mental disease.... The fact that part of the wording of a question may track the legal test by asking if the disease prevents one suffering from the disease from understanding the nature and quality of an act does not violate the rule. *The jury is left to ultimately decide whether the disease was so strongly present that the defendant himself suffered the effect of being unable to appreciate the quality of his act.*

*United States v. Kristiansen,* 901 F.2d 1463, 1466 (8th Cir.1990) (emphasis added); *see also United States v. Newman,* 849 F.2d 156, 165 (5th Cir.1988) ("The expert may not offer an opinion on the ultimate issues of whether the defendant was in fact induced to commit the crime or lacked predisposition. However, he may testify that the defendant's mental disease, defect or subnormal intelligence made him more susceptible than the usual person to persuasion by government agents or rendered him incapable of forming the specific state of mind required for the offense." (citation omitted)); Weinstein's Evidence ¶ 704[03] at 704–19 ("[Rule 704(b)] reaches all such 'ultimate' issues, such as premeditation in a homicide case, or lack of predisposition in entrapment. As with testimony going to the insanity defense, an expert may not offer an opinion on this kind of ultimate legal issue, *however, he or she may testify about a defendant's mental disease or defect, and its effect on the defendant's state of mind.*") (emphasis added).

To be sure, there are cases where experts have not been permitted to testify as to the mental state of the defendant. But in each of those cases, unlike the instant appeal, mental health professionals were asked to testify as to an ultimate *legal* issue. For example, in upholding a trial court's limitation on expert psychiatric testimony, the Seventh Circuit indicated,

"[t]his is not a case where the psychologist gave an opinion in psychological or lay terms that, if accepted, would logically require a particular finding on an ultimate question of fact, but left that inference for the jury to make; the question called for the expert himself to make that final inference and decide the question in legal terms." *United States v. Hillsberg,* 812 F.2d 328, 332 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987); *see also United States v. Felak,* 831 F.2d 794, 797 (8th Cir.1987) (" [defendant's psychiatrist] intended to testify that [defendant] was obsessed with his beliefs, and that as a result he did not possess 'the requisite mental state to satisfy the meaning of the words 'willful' or 'evasion' or 'fraud' as contained in the allegations raised against him.' ").

The trial transcript makes clear that Dr. Grove would have testified concerning DiDomenico's *psychiatric/medical* diagnosis without reaching the ultimate *legal* conclusion as to whether defendant had guilty knowledge. As defense counsel indicated,

> Dr. Grove will certainly not be testifying that [DiDomenico] did or did not know that the computers were stolen. That's not my intention to have him usurp the function of the jury. But he will testify about facts and about this disorder and about its effect on people that will, I believe, be very, very valuable to the trier of fact. And they are certainly free to reject or accept Dr. Grove's testimony and use it for whatever purpose they wish. So I don't intend to have him testify on the ultimate issue.

J.App. at 32.

Based upon this representation from defense counsel, I believe that Dr. Grove's proffered testimony was not prohibited by Rule 704(b). Any efforts by defense counsel to elicit prohibited testimony during direct or redirect examination could have been met with a sustainable objection by the government. Furthermore, when instructing the jury, the district judge could have made clear that Dr. Grove testified concerning medical/psychiatric matters and that the ultimate legal determination concerning guilty knowledge rested solely with the jury.

### C. *Harmless Error Analysis*

The erroneous exclusion of expert testimony does not require automatic reversal by this Court. When a district court commits an evidentiary error that does not rise to the level of constitutional error, the reviewing court must apply a harmless error analysis. *United States v. Onumonu,* 967 F.2d at 788.

In the instant matter, defendant sought to demonstrate that she did not have guilty knowledge that the computer equipment was stolen. At trial, and now before this Court, she asserted that, while a person not suffering a mental disorder would realize that the equipment was stolen, her mental disorder precluded her from understanding the illegal status of the equipment. In making such a claim, expert testimony is absolutely critical. Precisely because defendant's mental condition was not commonplace, Dr. Grove's testimony may well have assisted the jury in understanding her condition and its effect on her ability to have guilty knowledge. Accordingly, this testimony may have "produced a different verdict." *See id.* at 789 (quoting *United States v. Dwyer,* 539 F.2d 924, 928 (2d Cir.1976)). The district court's decision to preclude Dr. Grove's testimony was not harmless error.

### D. *Conclusion*

For the above reasons, it was an abuse of discretion for the trial judge to preclude the psychiatric testimony of defendant's expert witness concerning whether DiDomenico's alleged severe Dependent Personality Disorder impaired her ability to have guilty knowledge. I would reverse and remand.